IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2021 Session

**RONALD HONAKER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-02354        Jennifer Johnson Mitchell, Judge**

———————————————————

**No. W2019-01201-CCA-R3-PC**

———————————————————

The petitioner, Ronald Honaker, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel prior to and during his guilty plea hearing. Upon our review of the record, arguments of the parties, and pertinent authorities, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

David S. Mays, Memphis, Tennessee, for the appellant, Ronald Honaker.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

I.    **Guilty Plea Hearing**

On November 13, 2012, the petitioner entered a best interest plea to second degree murder and was sentenced to twenty-seven years at 100% to be served consecutive to a

prior parole violation[1]. The facts underlying the plea, as explained by the State, were as follows:

On July 6th of 2011, Bobby Hughes was reported missing by his sister. Interviews with other witnesses verified that Mr. Hughes was last seen on July 3, 2011. He was last seen with [the petitioner]. Witnesses and [the petitioner's] own admittance indicate that he and Bobby Hughes had a heated argument on July 3.

On July 8th of 2011, detectives with the Shelby County Sheriff's Office discovered a body in a wood steamer [trunk] in the basin of a creek bed located off Walsh Road north of Fite Road. That is here in Shelby County. The body located inside was wrapped in a comforter in advanced stages of decomposition but was fully clothed.

On July 9th, the autopsy revealed that the identity of this victim was Bobby Hughes. Officers were able to determine that this wood steamer [trunk] came from 2969 Eden, which was [the petitioner's] place of residence.

While in custody, [the petitioner] admitted to someone who he was incarcerated with that he killed Bobby Hughes and placed him in this [trunk]. In addition, [the petitioner] gave some inconsistent statements to the police, claiming to have an alibi which all proved false due to phone records and statements with cooperating individuals.

[The petitioner] also advised after his confrontation with the victim Bobby Hughes that he was going to kill Hughes and that he needed to leave the area because something bad was going to happen.

During the plea colloquy, the petitioner informed the trial court that he understood his rights. He further understood that, by pleading guilty to the charges, the petitioner would be waiving his right to a trial by jury, to confront witnesses against him, and to appeal. The petitioner testified he was satisfied with the representation of trial counsel, felt his case was properly investigated, and had no concerns or complaints about trial counsel's representation. Finally, the petitioner affirmed he was not being forced to plead guilty, and

---

[1] The petitioner's plea agreement was a global plea involving three charges. However, the petition for post-conviction relief challenges only the petitioner's plea to second degree murder, and therefore, we have included only those facts relevant to the issues raised on post-conviction and before us.

- 2 -

no one had made promises to him in exchange for his guilty plea. The trial court accepted the plea agreement and found the petitioner guilty of second-degree murder.

## II.     Post-Conviction Hearing

The petitioner filed a pro se petition for post-conviction relief, arguing, in part, the State committed a *Brady* violation and trial counsel was ineffective for failing to provide the petitioner with discovery.[2]  The post-conviction court appointed counsel, and the petitioner filed an amended petition for post-conviction relief.  An evidentiary hearing was held, during which Rachael Geiser, Paul Hagerman, Trini Dean, trial counsel, and the petitioner testified.

Rachael Geiser testified she was hired by trial counsel to investigate the petitioner's case.  As part of her investigation, Ms. Geiser was provided 36 CDs of discovery, which she reviewed and summarized in a report.  Ms. Geiser also reviewed two sets of paper discovery, totaling over 400 pages.  However, she did not update her report with the information contained in the paper discovery.  On October 2, 2012, Ms. Geiser and trial counsel met with the petitioner for approximately 40 minutes to discuss the petitioner's case.  Although Ms. Geiser was not aware of any additional discovery that existed at the time of her investigation, her report noted there "were probably additional CDs that we did not get."  Ms. Geiser testified she was not familiar with the name Cedric Monger but agreed her report noted "[t]he police had asked a couple of witnesses about a Cedric."

On cross-examination, Ms. Geiser testified she had only worked on the petitioner's case for three weeks prior to the petitioner's guilty plea.  Additionally, she agreed that it is not unusual to receive additional discovery during an investigation, especially in a complex murder case.

Paul Hagerman testified he was the lead prosecutor overseeing the petitioner's case. Following the petitioner's indictment, Mr. Hagerman received a discovery request from trial counsel.  Because he has an open-file policy in regards to discovery, Mr. Hagerman always provides copies of everything in his file, including information that he is not required to provide.  In the petitioner's case, Mr. Hagerman copied 36 CDs and over 400 pages of paper discovery and provided them to trial counsel.

Prior to negotiating a plea in the petitioner's case, Mr. Hagerman was given a second set of discovery pertaining to an initial investigation into Mr. Hughes' murder.  The majority of the initial investigation centered around a tip given by Cedric Monger.  Mr. Monger told police that he had witnessed part of the murder, which he claimed was

---

[2] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

committed by Dominic McCray. However, Mr. Monger later admitted to police that he did not witness the murder and had fabricated the story in order to receive the Crime Stoppers reward. Additionally, police investigated the petitioner's roommates' possible involvement in the murder after the petitioner came forward and implicated them. However, during the investigation into the petitioner's roommates, police discovered inconsistencies in the petitioner's statements and soon developed the petitioner as a suspect.

Mr. Hagerman arranged a meeting with trial counsel and informed him that detectives were monitoring the petitioner's jail phone calls, during which the petitioner was discussing his eagerness to plead guilty. During the meeting, Mr. Hagerman also disclosed a second set of discovery, which consisted of approximately 100 pages and 10 CDs. After briefly looking through the new discovery materials together, trial counsel informed Mr. Hagerman that he did not need a copy at that time. Although Mr. Hagerman did not show trial counsel the secondary discovery until their plea negotiation meeting, Mr. Hagerman testified he and trial counsel had previously discussed the fact that Mr. Monger had given the police a tip which he later recanted and that the petitioner's roommates were previous suspects.

On cross-examination, Mr. Hagerman agreed that much but not all of the information in the second set of discovery was included in the earlier discovery materials which Mr. Hagerman had provided to trial counsel. Mr. Hagerman also noted that Mr. Monger and Mr. McCray were mentioned several times in the earlier discovery, including the fact that DNA samples were taken from them during the investigation.

Trini Dean, a retired sergeant with the Shelby County Sheriff's Office, testified that he was the lead detective in this case. However, several months into the investigation, Mr. Dean was involved in a serious accident which required him to retire. On cross-examination, Mr. Dean testified that he received a tip from Mr. Monger, and as a result of that tip, he took Mr. McCray into custody on a 48-hour hold. However, after following up on Mr. Monger's tip, Mr. McCray was released, and Mr. Monger admitted that he had fabricated the story. While Mr. Dean investigated the tip from Mr. Monger, other detectives began to develop the petitioner as a suspect, and when it became apparent that the investigation was focusing on the petitioner, Mr. Dean's involvement waned.

On redirect examination, Mr. Dean agreed that Mr. Monger was able to identify both the trunk and blanket used to dispose of the victim prior to those items being disclosed to the public. However, on recross examination, Mr. Dean acknowledged that Mr. Monger's initial statement to police on July 10, 2011, did not mention the trunk or blanket, and that the information was included in a press release on July 19, 2011. Mr. Dean agreed it was possible that Mr. Monger gave the police information about the trunk and blanket

after it was publicly known. Mr. Dean also agreed that it is not unusual for specific details of a crime to be known on the street prior to being disclosed by the police.

Trial counsel testified he was appointed in February 2012, to represent the petitioner on several charges, including first degree murder. Trial counsel estimated that he spent over ten hours with the petitioner reviewing the case prior to the guilty plea hearing. Although trial counsel could not recall how many times he visited the petitioner at the jail, he vividly recalled at least one meeting there. On cross-examination, trial counsel noted his billing log from the petitioner's case listed ten meetings with the petitioner, including two jail visits. Specifically, his notation from May 22, 2012, stated that he reviewed discovery with the petitioner at the jail, and trial counsel testified this would have been the paper discovery that he received from Mr. Hagerman. On redirect examination, trial counsel acknowledged that the jail's visitation log did not list him as a visitor but insisted that he had visited the petitioner in jail and questioned whether the visitation log included attorney visits.

Regarding discovery, trial counsel testified he received 36 CDs and over 400 pages of discovery from Mr. Hagerman. Although trial counsel provided the petitioner with a copy of the paper discovery, he did not copy the CDs or watch them with the petitioner because it would have taken "months and months" to get through them. However, trial counsel did file a motion to have the petitioner moved to TDOC so that he could provide him with the electronic discovery. On cross-examination, trial counsel agreed the discovery process is "ongoing," and acknowledged that the discovery he received from Mr. Hagerman included many documents which were not required to be disclosed, including the investigator's hand-written notes.

Trial counsel could not recall a meeting with Mr. Hagerman in which he was shown additional discovery, and if Mr. Hagerman had informed trial counsel that he had evidence of another investigation into the murder, trial counsel would have wanted a copy. Additionally, trial counsel could not recall Mr. Hagerman discussing previous suspects, including Mr. Monger or Mr. McCray, at any point during the petitioner's case, and he would have disclosed the information to the petitioner if he had been aware of it. However, trial counsel later acknowledged that both Mr. Monger and Mr. McCray's names appeared on the first page of the earlier discovery under a list of suspects.

Regarding the plea offer, trial counsel testified the petitioner was "chomping at the bit to plead guilty" and was "overjoyed" when trial counsel presented him with an offer of 27 years. The petitioner was facing two especially aggravated robbery charges which each carried a sentence of 60 years at 100%. He was also facing the possibility of life without parole for the first-degree murder charge. Additionally, trial counsel informed the petitioner there was a possibility that the State would seek the death penalty if the murder

case went to trial. Because the petitioner's potential exposure was "astronomical," trial counsel advised the petitioner to accept the offer of 27 years. Moreover, trial counsel testified, even if he had been aware of the initial investigation into the murder, his advice to the petitioner regarding the plea offer would not have changed.

The petitioner testified he met with trial counsel three times regarding the first-degree murder charge, and each meeting lasted approximately five minutes. According to the petitioner, each visit occurred during the petitioner's court appearances, and trial counsel did not visit the petitioner in jail. During one of the visits, Ms. Geiser accompanied trial counsel to court and told the petitioner that "it look[ed] like [he had] a good case." According to the petitioner, trial counsel never discussed the case with him or provided or reviewed any discovery. On cross-examination, the petitioner acknowledged that he testified at his guilty plea hearing that trial counsel provided a copy of the written discovery.

Regarding his guilty plea, the petitioner testified that initially he did not want to plead guilty to the murder charge because he was innocent. However, trial counsel told the petitioner that the State would use the petitioner's previous convictions to make him "look like a monster." Because the petitioner was hesitant to plead guilty to the murder charge, trial counsel informed him that he could enter an *Alford*[3] plea, which the petitioner agreed to do. However, the petitioner testified that at the time of his guilty plea he was unaware that other suspects, including Mr. Monger and Mr. McCray, had been investigated by police. If the petitioner had known about the prior investigation, he would not have pled guilty and would have demanded to go to trial on the murder charge.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appealed followed.

### *Analysis*

On appeal, the petitioner argues his guilty plea was the result of ineffective assistance of counsel. Specifically, the petitioner argues trial counsel did not meet with the petitioner, provide discovery, or thoroughly investigate the petitioner's case. The petitioner also contends the State committed a *Brady* violation by failing to disclose information relating to the initial investigation into the victim's murder. The State contends the post-conviction court properly denied the petition.

---

[3] The petitioner refers to *North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), wherein the United States Supreme Court held that a criminal defendant may enter a guilty plea without admitting guilt if the defendant intelligently concludes that his best interests would be served by a plea of guilty.

- 6 -

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

A guilty plea must be knowingly, voluntarily, and intelligently entered in order to be valid. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). The court must determine whether the guilty plea evidences a voluntary and informed decision to pursue a guilty plea in light of the alternative options available to the defendant. *Id.* In the context of a post-conviction challenge to a guilty plea, both prongs of the *Strickland* test must be met. *Garcia v. State*, 425 S.W.3d 248, 256 (Tenn. 2013). Thus, to successfully challenge his guilty plea, the petitioner must show counsel's performance was deficient, and he "must establish a reasonable probability that, but for the errors of his counsel, he would not have entered the plea." *Adkins v. State*, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *Garcia*, 425 at 257 (Tenn. 2013).

## I.     *Brady* Violation

The petitioner contends the State committed a *Brady* violation by failing to disclose exculpatory evidence pertaining to the initial investigation into the victim's murder. The State contends the petitioner has failed to show that any exculpatory evidence was withheld.

Suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. Crim. App. 2012). In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Evidence is material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000).

In addition, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

However, the prosecution is not required to disclose information that the defendant either possesses or is able to obtain. *Johnson*, 38 S.W.3d at 56.

At the evidentiary hearing, Mr. Hagerman, the lead prosecutor in the petitioner's case, testified he received a second set of discovery shortly before the petitioner's guilty plea hearing. The discovery contained information regarding additional suspects who were investigated prior to the petitioner's arrest. While much of the information was cumulative and had already been provided to trial counsel in the first set of discovery, Mr. Hagerman acknowledged the discovery also contained information which had not been previously disclosed. During a meeting with trial counsel to discuss a possible plea agreement, Mr. Hagerman showed trial counsel the second set of discovery and offered to provide him with a copy. After briefly looking through the papers, trial counsel told Mr. Hagerman that he did not need a copy at that time. Additionally, Mr. Hagerman testified he and trial counsel had discussed the other suspects, Mr. Monger and Mr. McCray, prior to the receipt of the additional discovery. Trial counsel did not recall a meeting with Mr. Hagerman in which he was shown additional discovery, but if he had been made aware of additional suspects in the case, trial counsel would have requested a copy. Trial counsel also did not recall discussing Mr. Monger or Mr. McCray with Mr. Hagerman at any time. However, trial counsel later acknowledged both Mr. Monger and Mr. McCray's names were listed on the first page of the initial set of discovery that Mr. Hagerman provided, and the names were included in a list of suspects.

The post-conviction court found the State did not suppress any information concerning the prior investigation. More specifically, the post-conviction court found that

> [t]he State's testimony and [trial counsel's] testimony established that the State complied with their obligations to provide discovery to [the petitioner] and [trial counsel] pursuant to *Brady*. There were 473 pages of documents and thirty-six CDs of audio and video that were turned over to [the] petitioner, initially. There were an additional 170 pages and sixteen CDs that were discussed in the post-conviction hearing. Much of the additional discovery overlaps the initial discovery. Though there was some discrepancy over the precise discovery that was turned over want it was turned over, through testimony, it appears that the State ultimately submitted about 700 pages of documents to [trial counsel] according to [trial counsel'] own logs.

Relying on the testimony offered by Mr. Hagerman, trial counsel's records and "the Shelby County District Attorney General's Office's open-file discovery policy," the post-conviction court concluded that the information naming additional suspects "was disclosed to the defense and does not constitute a *Brady* violation.

Additionally, the post-conviction court found that

> [t]o the extent that information was not disclosed or shared by the [S]tate, this [c]ourt finds there has been no reasonable probability that, had the evidence been disclosed to the [p]etitioner, the result of the proceeding would have been different. The information was investigated by police and police concluded that the information was not supportive of filing charges against the named individuals. All named parties were deemed cleared as suspects. Further, the individual that presented the information to police later recanted their account and stated that the information was falsely given in an effort to receive "crime stoppers" money.
>
> While the additional items of discovery contained this information, much of the information contained in the additional documents of discovery [was] redundant to information contained on the 473 document pages, and thirty-six CDs of audio and video. Additionally, evidence from this separate investigation, including names of the individuals involved, are included on the initial set of discovery. When the context of the entire record is considered, the [p]etitioner fails to meet his burden to show that a *Brady* violation occurred.

Our review of the record mirrors the findings of the post-conviction court. In the order denying relief, the post-conviction court implicitly accredited Mr. Hagerman's testimony, and this Court will not re-weigh its credibility findings. *See Henley*, 960 S.W.2d at 578-79. Moreover, the petitioner has failed to prove the State suppressed the information from the additional discovery, which would be necessary to grant post-conviction relief. Accordingly, the petitioner's argument must fail, and he is not entitled to relief on this issue. *See Tidwell*, 922 S.W.2d at 500.

## II.     Ineffective Assistance of Counsel

The petitioner argues trial counsel was ineffective for failing to meet with the petitioner, provide discovery, and investigate the petitioner's case. The State contends the petitioner has failed to prove that trial counsel was deficient or that the petitioner was prejudiced.

At the evidentiary hearing, the petitioner testified he met with trial counsel three times to discuss the murder charge. Each of these visits occurred following a court appearance, and trial counsel did not visit the petitioner at the jail. According to the petitioner, Ms. Geiser accompanied trial counsel during one of the visits, but neither trial counsel nor Ms. Geiser reviewed any discovery with petitioner, and trial counsel did not

provide the petitioner with a copy of his discovery. The petitioner testified he would have rejected the plea offer and gone to trial if he had reviewed the discovery, particularly the information regarding previous suspects, prior to the guilty plea hearing. Trial counsel testified that he spent over ten hours with the petitioner reviewing and discussing the case prior to the guilty plea hearing. Trial counsel's billing log indicated that he met with the petitioner ten times, including two jail visits. Trial counsel also testified that he provided the petitioner with a copy of the paper discovery and reviewed it with the petitioner at the jail. Because the petitioner was "chomping at the bit to plead guilty," trial counsel quickly negotiated a plea offer of 27 years at 100%.

In finding trial counsel provided effective representation to the petitioner, the post-conviction court found that trial counsel "based his advice to [the] [p]etitioner on sound legal principals under the circumstance and recommended pleading guilty in light of the 'astronomical' exposure [the] [p]etitioner was facing in this case and two other cases." As noted by the post-conviction court, trial counsel secured a plea agreement on all the petitioner's cases for an effective sentence of twenty-seven years; however, had the petitioner gone to trial, he was "facing sixty years at 100% for one indictment; facing an additional [thirty] years for the second indictment for aggravated robbery; and, from the third felony indictment for [first-degree murder], life in prison without the possibility of parole due to qualification as a 'three-strike' candidate." Moreover, both trial counsel and Mr. Hagerman testified that the petitioner wanted to plead guilty. Trial counsel even noted that the petitioner was "overjoyed" upon receiving the State's offer. Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500.

Additionally, the petitioner testified at his guilty plea hearing that trial counsel and/or his investigator had reviewed all the State's discovery with him including Ms. Geiser's report summarizing all the information contained on the CDs turned over by the State. The petitioner also testified that he understood all of his rights, that he was satisfied with trial counsel, that he no one was forcing him to plead guilty, and that he wanted to plead guilty. This Court has previously stated that "'[a] petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" *Tina G. Strickland v. State,* No. E2013-01118-CCA-R3-PC, 2014 WL 605442, at *5 (Tenn. Crim. App. Feb. 14, 2014) (quoting *Blackledge v. Allison,* 431 U.S. 63, 74 (1977)), *perm. app. denied* (Tenn. June 23, 2014).

Finally, based on the post-conviction court's analysis which is fully supported by the record, the petitioner has failed to prove by clear and convincing evidence his factual

claim that he did not receive discovery. Thus, the petitioner is not entitled to relief on this issue.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.


_____
J. ROSS DYER, JUDGE